1, 2, 6, 1. United States v. Favreau Good morning, your honors. My name is Jemaisa Drake. I'm here today on behalf of the defendant appellate, Derek Favreau, and I would request two minutes of rebuttal time, please. Yes, you may have it. I'd like to begin with a discussion of the standard of review, and I primarily take my guidance from the U.S. Supreme Court's seminal decision on that subject, Ornelas. In that case, the U.S. Supreme Court instructed that an appellate court should give, quote, due weight to the trial court's inferences, and also that inferences drawn from a police officer's expertise or the trial court's knowledge of the community, quote, deserve deference. The court, however, said that the ultimate reasonable suspicion conclusion is not due, quote, sweeping deference, because ultimately a reasonable suspicion determination is an objective standard. This, of course, led Justice Scalia in his dissenting opinion to chastise the majority, saying that you can't simultaneously give due weight to a trial court's finding that an officer's inference of wrongdoing was reasonable if, quote, reasonableness is reviewed de novo. My takeaway from that opinion and from the guidance that this court and others has provided is that historical facts supported by evidence in the record are binding, and in this court we acknowledge that the trial court's historical factual findings are supported. We don't challenge them. But the district court's determination that behavior is suspicious is not entitled to, quote, sweeping deference. That is the very conclusion that is subject to de novo review. One of the other lessons that we receive from this court and others in this area of the case is that we don't consider the totality of the circumstances. And I assert that one of the circumstances that factors prominently in how we view this evidence is the officer's desire to find a reason to search the car in this case, the officer's stated purpose of using a Terry stop as a pretext for investigating a tip that was made one year earlier. We know, again, from Mornellis, that a police officer filters his or her information through their own lens of expertise. And I submit that in this case, the lens they were filtering their observation of defendant's behavior was their stated desire to come up with a suspicious justification. Except they had two further factual considerations supporting them. The first one was his bizarre behavior with the automobile. And the second one was his obvious lie when they stopped him basically to inquire into his driving, his obvious lie about, I guess, it was where he had come from. And so they were not simply sort of following their desires of a year ago, though they were doing that. But they had some evidentiary fact on top of that, which arguably justified their taking the next step. Isn't that true? Well, just to correct, Your Honor, the misstatement, according to the officers, that the defendant made his lie is where he was headed. Once he stopped, he tells the police, I'm headed home. When, in fact, he appears to be headed in the opposite direction. But I'd like to begin with the driving, what Your Honor has characterized as bizarre driving. And again, I think the inference that that was suspicious I think Justice Souter said bizarre behavior, not bizarre driving. I think it's limited to his driving. It's also his activities at the store, et cetera, et cetera. I'm sorry. I stand corrected. In either case, I think the inference that any of it, individually or collectively, is suspicious is subject to this Court's de novo review. And if we consider the driving, and we set aside the failure to make turns, and we look at the factor prominently in the analysis, is we have someone leaving their house, making a U-turn. Now, Trooper Pappas says that he thinks that the defendant may have made out his unmarked cruiser. But that's pure speculation. The defendant spouts off when he stopped about the police following him, but he references Wheeler's Market. You know, I'm a bit confused here. I thought you basically had conceded in your briefing that there was a basis for the stop, and that your more significant argument was an argument that the stop had been prolonged without justification. So why are we talking about the correctness of the initial stop? We are not. Yes, you are, and you're spending your time on that. Can you move on? Certainly. Although I will just add, the District Court mentions the U-turn, and in her analysis in reaching the conclusion that there is reasonable suspicion, to be clear, we acknowledge he committed traffic infractions, which would have supported the traffic investigation, which brings the discussion to whether there was reasonable suspicion that drugs would be found in the vehicle. The manner in which the stop was extended is important to the analysis. If, for example, in this case, but hypothetically, the police brought a bomb-sniffing dog, I think this Court would conclude that there was no reasonable suspicion to support that. Instead, they bring a drug-sniffing dog. So we have to ask whether there was reasonable suspicion that drugs would be found in the car. I think the officers had a hunch, but I don't believe that any information they had at the time rises to the level of reasonable suspicion. And I acknowledge there's a question... Including the evidence of not only bizarre driving habits, but as Judge Selya reminded me a moment ago, his strange behavior in going through sort of a lookout exercise at the police didn't start using a dog-sniffing dog until they had not only the evidence which was a year old, but the evidence that was just a few moments old. And the argument is that the one would confirm, tend to confirm the other, and at that point rise to the level of a degree of suspicion that at least would justify the use of the drug-sniffing dog. And the rest of the argument after the dog is obvious. But they weren't simply acting out on a naked suspicion a year old when they used the drug-sniffing dog. There was contemporary immediate evidence in between. Doesn't that in effect make your argument an impossible one? No, Your Honor. And I appreciate the mention of the fact that they weren't acting solely on this tip. And I think Trooper Pappas' testimony in that regard is revealing. Both he and Rooney say that the tip would never have been enough, so they needed to find more. Now, much of what they cite as important, the U-turn, the behavior at Wheeler's Market, is not caught on video. So the trial court is reliant on the officer's characterization of what they observed. Which the trial court found to be credible. That's correct. But as I said at the beginning, the inference of whether it is suspicious is founded in large part on deference to the police officer's testimony, which is colored by their own, what I call, self-fulfilling prophecy. Not in this case, because not only did the trial judge find the account of the bizarre behavior to be credible, but one of the first things that happened when the stop was made is that the defendant accused the police officers of stalking him, which seems to me to verify, at least in part, the interpretation of the bizarre behavior that the police had put on him. Even if that's so, as I assert in the brief, complaining or even suggesting that someone has been under police surveillance is not suspicious behavior. Okay. You've run out of time. You have two minutes reserved on rebuttal. Thank you. Good morning. May it please the court. Renee Bunker on behalf of the United States. As Judge Lynch pointed out, I thought we were here to discuss whether the approximate three-minute delay from the end of the traffic stop to get the dog out of the car, circle that Howie dog around the vehicle to the alert was reasonable under, and this is definitely a totality of the circumstances case. The standard of review is by no means in question. It's very clear. I would point to the Espinoza case that is cited in the reply brief. The inferences drawn from the facts by objectively reasonable inferences drawn from the facts by the officers, the experienced officers, and by the district court, are reviewed here for clear error only, and that's a very deferential standard as the court knows. Whether they gave rise to reasonable suspicion is, of course, reviewed de novo. So that's not really an issue here. The totality of the circumstances included, excuse me, the totality of the circumstances included, as we cite in our brief, approximately nine facts that stood out, one of which was the informant's information that Favreau was using his Pacifica. He had a factory, non-factory compartment in the dashboard, and he was using that to traffic drugs. Another one was that bizarre behavior by Favreau as he first, on 7th Street, was initially signaling to go right, up 7th Street. Instead, he crossed the street right towards the agent. Pappas said his vehicle is quite well known in the Auburn area. Favreau then pulled a U-turn, headed back towards South Main Street, signaled right to now go down Main Street. The district court also had Trooper Rooney, I mean Pappas' testimony at Wheeler's Market. Favreau's conduct got even more bizarre. He went into the store. He came out of the store. He went to, Wheeler's is on the corner of 8th and South Main. Favreau went to the 8th Street side of the lot, looked up and down to see who was watching. He went to the South Main Street side, looked up and down to see who was watching to see if the agents might be coming in. Any objectively reasonable officer could infer that that was counter-surveillance and that he was checking to see if the police were, in fact, on to him. And there was more because when, as the district court and the video will show, when Trooper Rooney then follows Favreau, leaves, he goes up 8th Street away from the direction of home. Rooney follows him, gets in behind him on 8th Street and watches him take that left turn onto Broad Street without signaling. Rooney starts the lights on the video, starts the lights and siren and the audio portion of the video then kicks in. And what does he do? He pulls over, as common sense indicates that anyone typically does, he continued to drive onward. He not only didn't fail to pull over, another crime as the district court noted, but he took another left turn without signaling onto 9th Street before finally pulling over. Then we have the bizarre responses that the district court highlighted and that's on the video I'm sure you'll watch where he's accusing the agents of Rooney of stalking him, etc. And you also have the nervousness that you'll see on the video and that the district court and Trooper Rooney at the time indicated he asked Favreau, why are you so nervous? When he asked, when the trooper said, put your hands behind your back and interlock your fingers, you'll see his hands go up behind his head and then behind his back and then in front of his body and then back behind his head again. It was a fair indicator, a fairly experienced officer to find that this man was on the nervous side. Did the defendant and Officer Rooney have a prior encounter? Did they know each other? Do we know one way or the other? I believe the testimony was that, no, I don't think Rooney, Trooper Rooney and Favreau had any history at all. I think Trooper Pappas, I think on cross-examination maybe, the defense attorney asked Pappas, have you ever seen my guy walk before in response to the Wheeler's bizarre conduct? And I think Trooper Pappas testified that I had seen him walk a couple times before and Pappas found this conduct to be very unusual. So the accusation that Rooney is stalking him is based on Rooney having followed him? That is, and I think coupled with, as I think the court indicated, the corroborated information that Favreau then accused Pappas and Gagnon when they arrived on the scene of, hey, you guys were following me, I saw you up at Wheeler's, which of course corroborates the testimony about the bizarre scouting behavior that Mr. Favreau was doing up at Wheeler's. And then, although not significant, it's a totality of the circumstances inquiry, not intent of the officers. We have the $400 cash in the defendant's pocket that the district court noted for apparently a quick errand up to Wheeler's Market, and we have Favreau's statement that when asked where you headed, he said, I'm headed home, which was clearly not the case because he headed in the exact opposite direction, up 8th Street, away from home. So we submit that the court correctly found that that totality of circumstances easily gave rise to reasonable suspicion. Why was $400 in cash indicative of anything? I would actually expect drug dealers doing cash trades to have more than that. It's one factor, a lot of cash in the defendant's pocket. Again, in isolation, quite innocuous perhaps. Added to the totality, it could have been a bulge of banking soda in the last case, but when you're talking about the totality of the circumstances, it's just one more condition. Even in the totality, it seems to me to add nothing. I don't think even in the totality of this case, $400 makes your case stronger by an iota. Yeah, I have to say that's my view of it as well. Well, if the court wants to ignore that factor altogether, it would not seem to be problematic in terms of the totality. And once again, did the government urge this on the district court? I don't think it was urged. It was one factor. It was listed as a factor in the argument made to the district judge. Right, and you'll see on the video.  The district court mentioned it, and you'll see on the video. Why? Why is the government presenting this argument to the district court? Because they think there's case law out there. A lot of cash in one's pocket. Yeah, but this is just $400. This isn't $4,000. Right, well, without belaboring the point, again, perhaps it was certainly not an incredibly emphasized fact. You'll see it mentioned on the video during the pat-down, and I think it was listed among the totality, but it's certainly not crucial here when considering all of the other facts. And with all due respect, what the appellant appears to be asking this court to do, when I look at all of the arguments, is to ask for a new rule that in the context of Otherwise, that officers, experienced officers, inferences drawn from the facts. And that this court apparently must minimize or discount the district court's inferences drawn from the facts, just because this was a protectural stop. And I have come across no case law for that proposition. That the nature of the protectural stop somehow converts this into a subjective inquiry test, rather than what the Supreme Court has made clear is an objective test. And with that, we'll submit unless the court has further questions. No, thank you. Thank you. We ask that you affirm. Ms. Drake, you have two minutes. Thank you, Your Honor. Even if we were to agree, assuming arguendo, that the behavior is suspicious, in what way does it suggest that drugs would be found in the car? If the testimony from these police officers is that evasive driving, which is how the U-turn was characterized, or checking to see if you're under surveillance, or any of that, was consistent with someone who stole televisions, presumably there would be reasonable suspicion to investigate for televisions. If it was someone who possesses explosives, presumably they could have brought a drug dog around. There has to be some sort of limitation. And the tip in this case does not provide that connection, because it was made a year ago. What significance is it to the fact that it was made a year ago? We're talking about a change to the physical structure of the vehicle. This isn't a transient thing that we can expect to disappear in 20 days or some finite period of time. This is a vehicle that the defendant, according to the tip, which the officers testified was from a reliable source, was made permanently to the structure of the vehicle that the defendant still owned and was driving at the time of the stop. The tip about the trap, the physical alteration of the car, might not have been stale. No, but it was a tip about the alteration of the car for the purpose of conveying drugs. Well, that's right. But the tip that he was a drug dealer, for which, and I urge this court to review that portion of the testimony very carefully, because what Pappas actually testifies is that he knows very little about this source of information, and that this person has actually not provided anything other than, quote, the information that has been reliable in the past. The information that was reliable, if I may just finish the sentence.  Thank you. Thank you.